UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                              )   CRIMINAL FILE
UNITED STATES of AMERICA      )   NO. 17-MJ-499 (HB)
                              )
         vs.                  )   Courtroom 9 East
                              )   Thursday, June 15, 2017
TODD SEAVER KNUTSON           )   Minneapolis, Minnesota
                              )   9:36 a.m.
------------------------------------------------------------


## AUDIO DISC TRANSCRIPTION OF:


## CONTINUED PRELIMINARY / DETENTION HEARING


BEFORE THE HONORABLE DAVID T. SCHULTZ
UNITED STATES MAGISTRATE JUDGE



**A P P E A R A N C E S:**


For the Government:     **OFFICE OF THE U.S. ATTORNEY**
                        By:  ANDREW S. DUNNE
                             Assistant U.S. Attorney
                        600 United States Courthouse
                        300 South Fourth Street
                        Minneapolis, Minnesota  55415


For the Defendant:      **JOHN C. BRINK, LAWYER**
                        By:  JOHN C. BRINK, ESQUIRE
                        310 Fourth Avenue South - Suite 1008
                        Minneapolis, Minnesota  55415


**AUDIO DISC TRANSCRIBED BY:**

                        **TIMOTHY J. WILLETTE, RDR, CRR, CRC**
                        Official Court Reporter - U.S.D.C.
                        1005 United States Courthouse
                        300 South Fourth Street
                        Minneapolis, Minnesota  55415
                        612.664.5108

1          (9:36 a.m.)

2                    **P R O C E E D I N G S**

3                    **IN OPEN COURT**

4          (Defendant present)

5                    THE COURT:  All right.  We are here on the matter

6     of United States vs. Todd Seaver Knutson, Case Number

7     17-MJ-499.

8                    Mr. Dunne, note your appearance for the record,

9     please.

10                   MR. DUNNE:  Andrew Dunne, D-U-N-N-E, on behalf of

11    the United States.  Good morning, Your Honor.

12                   THE COURT:  Good morning, Mr. Dunne.

13                   Mr. Brink?

14                   MR. BRINK:  Good morning, Your Honor.  John Brink

15    for Mr. Knutson, who's present.

16                   THE COURT:  Good morning, Mr. Brink.  Good

17    morning, Mr. Knutson.

18                   THE DEFENDANT:  Good morning.

19                   THE COURT:  Before we begin, let me just inquire.

20                   Mr. Brink, I assume that you've had an adequate

21    opportunity to meet with your client between Monday, I

22    believe it was, and today.

23                   MR. BRINK:  I have, Your Honor.  There's just one

24    issue I'd like to bring to your attention.

25                   THE COURT:  Okay.

1      MR. BRINK:  And that is -- let's see.  Today is

2    Thursday, Wednesday -- Tuesday, Mr. Knutson tried to call me

3    and they said you can't have a call until you get your hour

4    out of the cell, which since he's been up there has been

5    either 6 o'clock in the afternoon or 7 o'clock in the

6    evening, and of course my office is usually closed after 5.

7    So it's just one more -- you know, no matter what you think

8    of, they think faster, so it's hard to stay ahead of them.

9      THE COURT:  Certainly I can understand that it

10   might be an inconvenience.  I'm not so sure there's much, if

11   anything, I can do about it, but I want to make sure that

12   you've had an opportunity to --

13     MR. BRINK:  Yeah, we've met --

14     THE COURT:  Okay.

15     MR. BRINK:  -- up at the jail two, three times.

16     THE COURT:  Okay.  Thank you.

17     I believe we are here on a preliminary and a

18   detention hearing, correct, Mr. Dunne?

19     MR. DUNNE:  Your Honor, the Government would call

20   Matt Parker.

21     THE COURT:  Okay.

22     **MATT PARKER, GOVERNMENT'S WITNESS, SWORN**

23     THE COURT:  Make sure you state your full name and

24   spell it for the record.

25     THE WITNESS:  Matthew Parker, M-A-T-T-H-E-W,

1    P-A-R-K-E-R.

2                    **DIRECT EXAMINATION**

3    BY MR. DUNNE:

4    Q.  Special Agent Parker, how are you currently employed?

5    A.  I work for the FBI as a Special Agent.

6    Q.  How long have you been a Special Agent for the FBI?

7    A.  About 18 years.

8    Q.  Are you familiar with the facts of this particular

9    investigation leading up to the criminal complaint against

10   Todd Seaver Knutson?

11   A.  Yes.

12   Q.  In fact, are you the affiant on that complaint?

13   A.  I am.

14   Q.  It's my understanding that this investigation involved a

15   search warrant issued by a state court for 890 Arkwright in

16   St. Paul?

17   A.  That's correct.

18   Q.  When was that search warrant executed?

19   A.  June 6th.

20   Q.  Prior to the execution of that warrant, was there an

21   operational plan formulated by law-enforcement concerning

22   the manner in which the search warrant would be executed?

23   A.  Yes.

24   Q.  All right.  Were you part of that operational plan?

25   A.  Yes.

1    Q.  What was the operational plan?

2    A.  We wanted to have Mr. Knutson out of the house when we

3    did the entry, so our plan was to set up surveillance at the

4    house and watch and wait for him to leave, arrest him so

5    that he would be in custody when we made entry, which would

6    make it safer for law-enforcement.

7    Q.  Why did law-enforcement formulate that operational plan

8    concerning the execution of the search warrant at 890

9    Arkwright?

10   A.  Two reasons.  First, in any situation, it's better to

11   have the person come out of the house so that they can't

12   create a barricade or hostage situation.

13          In addition, in this case we had information that

14   Mr. Knutson was dealing in methamphetamines, possibly using

15   methamphetamine, had guns, and could possibly use those

16   against law-enforcement, so we felt it appropriate to wait

17   on him to come out before we made entry.

18   Q.  In addition to the search warrant itself on June 6th,

19   2017, when officers were conducting surveillance at 890

20   Arkwright, prior to the execution of the search warrant, was

21   there any other legal process that law-enforcement had in

22   connection with Todd Seaver Knutson?

23   A.  Yes, the Family Violence Unit at St. Paul Police had

24   issued a felony pickup for Mr. Knutson based on a felony

25   domestic abuse case.

1    Q.  Now, I'm not -- what is a felony domestic pickup?

2    A.  It's essentially a probable cause arrest authorized by a

3    sergeant in the St. Paul Police.

4    Q.  Did officers set up surveillance at 890 Arkwright on

5    June 6th?

6    A.  Correct.

7    Q.  Do you recall what time of day it was?

8    A.  May have started around 10 or 11 a.m.

9    Q.  Okay.  And what observations were made by the officers

10   conducting that surveillance?

11   A.  At approximately -- well, shortly after 2 p.m., officers

12   saw Mr. Knutson leave the house, come out of the door, get

13   onto a motorcycle.  He was with another gentleman who was on

14   a motorcycle and they road north on Arkwright towards an SA

15   gas station at Arkwright and Maryland.

16   Q.  Okay.  How far was -- I'm sorry.  Did they stop at the

17   SuperAmerica?

18   A.  They did.

19   Q.  Okay.  How far is that SuperAmerica located in relation

20   to the address at 890 Arkwright?

21   A.  Maybe half a mile.

22   Q.  Okay.  What happened once Mr. Knutson and this other

23   individual arrived at the SuperAmerica?

24   A.  Law-enforcement set up at the SuperAmerica.  Mr. Knutson

25   and the other man went inside the SuperAmerica.  They had

1    parked their motorcycles out front.  When Mr. Knutson and

2    the other man came out of the SuperAmerica, the officers

3    moved towards him to arrest him.  When Mr. Knutson saw

4    law-enforcement, he fled on foot going all the way around

5    the SuperAmerica, back out onto Maryland Avenue, and he was

6    apprehended in the middle of Maryland Avenue.

7    Q.  Okay.  It's my understanding that officers following the

8    arrest of Mr. Knutson went back to the SuperAmerica the next

9    day.

10   A.  Correct.

11   Q.  Why was that?

12   A.  We wanted to review the video to see if he had thrown

13   anything or discarded anything along the way.  We had done a

14   search immediately after the arrest and found some cash that

15   he had dropped.  We wanted to see if there was anything.

16   Q.  And were officers able to watch the surveillance video

17   from the SuperAmerica station regarding that incident?

18   A.  Yes.

19   Q.  And what did officers observe?

20   A.  As he rounded the southwest corner of the building and

21   then headed back northbound, his arm -- it appears that he's

22   throwing something up in the air with his arm in the

23   direction -- if he were moving his arm in that direction, it

24   would have been in the direction of the store and upward.

25   Q.  Okay.  Following the -- following watching that video,

1    did officers search the roof of the SuperAmerica?

2    A.  They did.

3    Q.  And were any objects recovered?

4    A.  They found a .25 caliber handgun.

5    Q.  Serial number on that handgun?

6    A.  Obliterated.

7    Q.  All right.  Now let's go back to the search warrant.

8          So it's my understanding that on June 6, after

9    Mr. Knutson was arrested at the SuperAmerica, was the search

10   warrant executed at 890 Arkwright?

11   A.  That's correct.

12   Q.  Briefly, can you describe for us the physical layout of

13   that house.

14   A.  It's a single-family home.  It had two detached garages.

15   It had a main level with, you know, kitchen and living

16   areas, and then upstairs there were three bedrooms.  One

17   bedroom had a bed, one bedroom had a futon folded up to the

18   couch, and the last one had no bed or futon.

19   Q.  Okay.  Upon entry into the house, what's the first room

20   that an entrant would be in?

21   A.  The front door was barricaded, so I believe the tactical

22   folks went in either the side or the back door and they

23   would have been entering a living area.

24   Q.  Okay.  When you say the door was barricaded, what do you

25   mean?

1    A.  There was a bunch -- there was a bunch of stuff piled up

2    against the door and then around the house we found door

3    jams.  They're metal pieces that you prop against the

4    door -- they're commercially available -- in order to

5    prevent somebody from entering.

6    Q.  Okay.  So upon entry, were there any individuals in the

7    living room area that were encountered by law-enforcement?

8    A.  There were three people on the property.  I don't know

9    if they were all inside.  I believe there was a female who

10   may have been in the driveway, but the tactical folks who

11   went in first encountered three people when they got in.

12   Q.  And were those three people interviewed by

13   law-enforcement?

14   A.  Yes.

15   Q.  Did those three people make any statements to

16   law-enforcement regarding Mr. Knutson?

17   A.  The two men both stated that Mr. Knutson -- that it was

18   his house.  One of them said that they had within the week,

19   I believe, purchased methamphetamine from him.  The female

20   that was there declined to give a statement and asked to

21   speak with an attorney.

22   Q.  Okay.  It is my understanding from reading your

23   affidavit -- and particularly paragraph 8 of your

24   affidavit -- that six firearms were recovered during the

25   execution of the search warrant?

1    A.  That would be six in addition to the one from the roof

2    of the SA, yeah, so seven in total.

3    Q.  Six pursuant to the search warrant.

4    A.  Correct.

5    Q.  What I'd like to do is list the guns as they are listed

6    in your affidavit and if you can tell us where they were

7    located inside the house.

8           First there is an FN nine-millimeter handgun.

9    Where was that recovered?

10   A.  Yes.  That's a semiautomatic pistol that was found on a

11   shelf behind glass in the living area downstairs.

12   Q.  Okay.  There were two Ruger Vaquero, V-A-Q-U-E-R-O, .45

13   caliber handguns.  Where were those recovered?

14   A.  Those were found in a -- on a closet shelf in I believe

15   the southeast bedroom.  Those are, like, kind of

16   pearl-handled pistols like you'd see in an old western.

17   Q.  There is listed in your affidavit a MAK-90 7.62 assault

18   rifle.  Where was that recovered?

19   A.  That would have been in the northwest bedroom, and

20   that's -- did you say the MAK-90?

21   Q.  That's what I asked, yes.

22   A.  Yeah.  The MAK-90 is kind of a ripoff, I'm told, of an

23   AK-47 assault rifle.

24   Q.  Okay.  You have listed a Master Piece Arms MAC-10, .45

25   caliber handgun?

1   A.  Yes.  That's a .45 caliber handgun that -- I can't tell

2   you it was done in this case, but it's frequently converted

3   to full auto to be a machine pistol.  But just looking at

4   it, it would be a handgun with very large capacity.

5   Q.  Okay.  Where was that located?

6   A.  That was located in the northwest bedroom.

7   Q.  Okay.  And then the last of the six firearms listed in

8   your affidavit is a Marlin .22 caliber rifle.  Where was

9   that recovered?

10   A.  That was also in that northwest bedroom.

11   Q.  Okay.  Were officers able to conduct any investigation

12   concerning those seven hand -- or those seven firearms that

13   we talked about concerning whether or not they were stolen?

14   A.  Four of the handguns came back as stolen when we checked

15   them in NCIC.

16   Q.  Okay.  All right.  Now what I want to do, if I can, is

17   go back to the rooms where you found those firearms to ask

18   you were any other items recovered from those rooms in

19   addition to the guns.

20           So the first thing you talked about was a

21   nine-millimeter handgun that was taken from the living room

22   area?

23   A.  Correct.

24   Q.  Were there any other items of evidence that were

25   recovered from that area by law-enforcement that you can

1  recall?

2  A.  I believe there may have been some small amounts of meth

3  found.  In addition, there was an ammo can with a large

4  amount of ammunition.

5  Q.  Okay.  How about a scale?

6  A.  There was also a scale which could be used for weighing

7  drugs.

8  Q.  All right.  And when we talk about a scale, we're not

9  talking about a scale you step on to weigh yourself.  It's

10  to weigh drugs.

11  A.  Correct.

12  Q.  You mentioned that the MAC-10, the MAK-90 and the .22

13  caliber rifle were recovered from what you describe as the

14  northwest bedroom.  Is that one of the bedrooms that had a

15  bed in it?

16  A.  That was the only room that had a bed in it.

17  Q.  Okay.  Any other items recovered from that room of

18  evidentiary value that you can recall?

19  A.  There were mailings in Mr. Knutson's name.  There was a

20  bulletproof vest leaning up against the three guns.  There

21  was marijuana, I think 20 grams, and there was about $2200

22  in cash.

23  Q.  Okay.  I specifically want to ask you whether or not

24  there were any magazines for firearms recovered from that

25  room.

1    A.  Yes, the magazines for the MAK-90 assault rifle, there

2    were two of them taped together so that you could quickly

3    when you emptied one move to the next, and it was the same

4    for the MAC-10.  Two of the magazines were taped together so

5    that once you emptied one you could move to the next

6    quickly.

7    Q.  And in those magazines, was there ammunition loaded into

8    the magazines?

9    A.  Yes.

10   Q.  All right.  You mentioned that there were two Ruger

11   Vaqueros, these pearl-handled revolvers that you were

12   talking about, from the southeast bedroom?

13   A.  Correct.

14   Q.  Is that the bedroom with the futon?

15   A.  Yes.

16   Q.  And were any other items of evidentiary value recovered

17   by law-enforcement that you can recall from that bedroom?

18   A.  I believe there were mailings in Mr. Knutson's name.

19   There was also a backpack in the same closet with the two

20   pistols that contained somewhere around three pounds or 1400

21   grams of a substance that tested positive for

22   methamphetamine.

23   Q.  Okay.  Was there another backpack that was recovered

24   from that room?

25   A.  Yes, and I believe that was full of shotgun ammunition.

1    Q.  Okay.  Do you recall where the backpack that contained

2    the methamphetamine, where in the room was that recovered?

3    A.  In the same closet with the pistols.

4    Q.  Same with the backpack of shotgun ammo?

5    A.  I'm not sure where that was.  It probably was in the

6    closet, but I couldn't say for certain.

7    Q.  Okay.  Just a couple more.  The seven firearms that

8    we've been talking following the execution of the search

9    warrant and the recovery of those firearms, did you reach

10   out to the Bureau of Alcohol, Tobacco & Firearms to inquire

11   about any interstate nexus regarding each of those firearms?

12   A.  Yes, I talked to a Special Agent who is a gun expert,

13   and he told me that none of those guns were manufactured in

14   Minnesota and they all must have at some point traveled in

15   interstate commerce.

16   Q.  You list in your affidavit -- I believe it's paragraph

17   5 -- that Mr. Knutson has ten felony convictions in the

18   state of Minnesota, and then you list narcotics, fleeing,

19   assault, burglary, and terroristic threats.

20          Because of those felony convictions in Minnesota,

21   was Mr. Knutson prohibited from possessing any firearms

22   under federal law?

23   A.  Yes, he was.

24   Q.  Okay.  I want to talk about two incidents and then I'm

25   through.

1              It's my understanding that either the day of

2    Mr. Knutson's arrest or the following day, that St. Paul

3    police officers went to him to collect a DNA sample.

4    A.   Correct.  They obtained a warrant to take his DNA by way

5    of a buccal swab.

6    Q.   Okay.  Can you just explain for us how that's done.

7    A.   You would go in, explain to Mr. Knutson what the plan

8    is.  You have Q-tips.  You essentially scrape the inside of

9    the cheek with a Q-tip, do it twice, and then we package

10   those and send them to a lab.

11   Q.   That was done in this case?

12   A.   It was.

13   Q.   Where was that?

14   A.   That would be at the Ramsey County LEC.

15   Q.   And Mr. Knutson had at least complied with taking those

16   buccal swabs.

17   A.   Eventually.

18   Q.   It's my understanding that after taking the buccal

19   swabs, an incident occurred.

20   A.   Well, there was an incident when the officers went to

21   take the buccal swabs.  He became agitated.  He kicked a

22   table or a door, clenched his fists and essentially

23   challenged the officers to a physical confrontation.

24   Q.   No physical confrontation ensued.

25   A.   Correct.

1    Q.  All right.  It's also my understanding from reading the

2    amended Pretrial Services Report that following

3    Mr. Knutson's arrest and appearance in federal court, there

4    was an incident in the Sherburne County Jail.

5    A.  Yeah.  I think there may have been two.

6    Q.  Okay.  And you reviewed the amended report prepared by

7    Pretrial Services.

8    A.  Correct.

9    Q.  And you know -- do you know from speaking with folks at

10   the Sherburne County Jail whether something additional

11   appeared than what was reported in the Pretrial Services

12   Report?

13   A.  I received information regarding an incident that

14   happened I believe the next morning following the incident

15   that's described in the pretrial report.

16   Q.  Why don't you tell us what happened.

17   A.  The first one or the second one?

18   Q.  The one that's not reported in the Pretrial Services

19   Report.

20   A.  My understanding is that Mr. Knutson was in his cell.

21   He had broken apart something that was plastic.  I don't

22   know if it was a bin or something, but he had the pieces of

23   it.  They thought that that was a threat, that he could use

24   those pieces of plastic, and they decided that he needed to

25   be extracted from the cell so they could take those things

1   away from him and put him in a different cell.

2           So I think what they do is, they have him put his

3   hands behind his back and back up towards the guards so that

4   they can handcuff him and take him out of the cell.

5   Mr. Knutson agreed to be handcuffed, put his hands behind

6   his back, backed up, but when the corrections officers

7   entered the cell, Mr. Knutson turned around and attacked

8   them.  A fight ensued.  They said they might have used

9   pepper spray, but it's their understanding he had asthma, so

10  instead he had to be Tased, at which point he finally

11  complied, and it's my understanding two corrections officers

12  were injured during the fight.

13  Q.  Was the jail, Sherburne County Jail, put on lockdown

14  because of that incident?

15  A.  It's my understanding it was put on lockdown.

16          MR. DUNNE:  I have nothing further, Your Honor.

17          THE COURT:  Thank you, Mr. Dunne.

18          Mr. Brink?

19          MR. BRINK:  Thank you, Your Honor.

20                      **CROSS-EXAMINATION**

21  BY MR. BRINK:

22  Q.  Good morning, Special Agent Parker.

23  A.  Good morning.

24  Q.  Were you the affiant on the search warrant?

25  A.  I was not.

1    Q.  Did you prepare any reports with respect to this matter?

2    A.  I have prepared reports, yes.

3            MR. BRINK:  Your Honor, pursuant to Rule 26.2, I

4    request production of those.

5            MR. DUNNE:  Your Honor, we don't have the -- are

6    they written and approved and have been provided to the

7    Government?

8            THE WITNESS:  No, I've drafted them.  They haven't

9    been approved or put to the file yet.

10           MR. DUNNE:  I don't have them.

11           MR. BRINK:  Well, Rule 26.2, Your Honor, says I

12   get reports that -- after he's testified -- reports that

13   he's authored or adopted.

14           MR. DUNNE:  Your Honor, I don't disagree with what

15   Rule 26.2 says.  It's just that the FBI protocol -- it

16   doesn't become an official report until it's signed off on

17   and distributed.

18           THE COURT:  All right.  Understood.  And it's not

19   available yet.

20           MR. DUNNE:  I haven't seen it.

21           THE WITNESS:  I could give you the sum and

22   substance.  It was very brief.

23           THE COURT:  Well, I think, Mr. Brink, I understand

24   your position.  I don't think they can be produced before

25   they're reports.  So to the extent that you have moved to

1    produce them here and now, that motion is denied, but to the

2    extent that you want them when they're available, that

3    motion is granted.

4              MR. DUNNE:  Your Honor, I will state for the

5    record, as soon as I -- and I will ask Special Agent

6    Parker -- as soon as they're approved, please provide me

7    with a copy of them and I will provide them to Mr. Brink.

8              THE WITNESS:  Yes, sir.

9              MR. BRINK:  I would like permission, Your Honor,

10   if there's anything germane in those reports, I would like

11   permission to come back and address it.  I don't know that

12   there's going to be anything to talk about, but if there is,

13   I'd like permission to apply for that.

14             MR. DUNNE:  No objection.

15             THE COURT:  That's granted as well, Mr. Brink.

16   BY MR. BRINK:

17   Q.  Okay.  Special Agent, tell me this:  What is

18   Mr. Knutson's connection to this house at 890 Arkwright?

19   A.  He lives there.

20   Q.  How do you know that?

21   A.  His mother told us that, the three people who were at

22   the house told us that.  On his phone there are pictures of

23   him standing in the bedroom wearing the bulletproof vest

24   that we found at the house.  A confidential informant told

25   us that, a cooperating defendant told us that.  We saw him

1    coming out of the house.  That and I'm sure there's others.

2    Q.  Who's the confidential informant?

3         MR. DUNNE:  Objection, Your Honor.

4         THE COURT:  Sustained.

5    Q.  Who's the cooperating defendant?

6         MR. DUNNE:  Objection, Your Honor.

7         THE COURT:  Sustained.

8    Q.  Now, before -- now, you learned some of this stuff,

9    obviously, talking to the three people who were present

10   after the search warrant was obtained.  What was your

11   information before you obtained the search warrant?  What

12   was your information as to who said Mr. Knutson lived there,

13   before you applied for the warrant?

14   A.  I'm not -- I don't follow the question.

15   Q.  Okay.  You've told us that his mother said he lived

16   there, the three people who were present said he lived

17   there, and an informant and a cooperating defendant said he

18   lived there.  What I want to know is, before you applied for

19   the warrant, who said he lived there?

20   A.  The cooperating defendant, the informant.

21   Q.  How long had he lived there?

22   A.  I don't know.

23   Q.  You had this house under surveillance on June 6th?

24   A.  Yes.

25   Q.  How many of you gentlemen were -- or ladies and

1    gentlemen were surveilling it?

2    A.  I don't know for certain.  Maybe ten.

3    Q.  So you had two or three carloads.

4    A.  I don't know how many cars we were in.

5    Q.  And you were watching it because you were going to

6    execute this search warrant.

7    A.  Correct.

8    Q.  And you wanted him out of there for safety purposes.

9    A.  Correct.

10   Q.  Who was the companion that he left with?

11   A.  I don't know.

12   Q.  Had you had contact with that person previously?

13   A.  No.

14   Q.  So you followed him to the SuperAmerica.

15   A.  Correct.

16   Q.  All right.  And arrested him.

17   A.  Correct.

18   Q.  What did you arrest him for?

19   A.  It was a felony pickup out of the Family Violence Unit,

20   and then he was booked for narcotics and felon in

21   possession.

22   Q.  So he was arrested on this probable cause pickup.

23   A.  Correct.

24   Q.  Now, I'm given to understand that that was a

25   time-limited pick up and it had expired, is that correct, or

1    have I got that wrong?

2    A.  I believe you have that wrong.  The sergeant in charge

3    of the case had authorized, one of the sergeants from my

4    unit on that, so it had been reauthorized is my

5    understanding.

6    Q.  So it had expired once?

7    A.  I don't know if it had or not, but it had been

8    authorized by the sergeant very recently.

9    Q.  What sergeant is that?

10    A.  I don't know his name.  He's in the Family Violence

11    Unit.

12    Q.  When was it reauthorized?

13    A.  I don't know.

14    Q.  But you have it on good authority that it had been

15    reauthorized?

16    A.  Correct.

17    Q.  And you say that was a felony pickup?

18    A.  Correct.

19    Q.  All right.  And when you approached -- when you

20    approached Mr. Knutson, you say he took off?

21    A.  Correct.

22    Q.  How -- tell us the circumstances.  Where was he parked,

23    where were you parked?  How did this chase occur?

24    A.  He was coming -- I did not see it firsthand.  I was

25    behind the SA, so I didn't see when he first took off.  My

1    understanding is he came out, started to walk toward his

2    motorcycle.  SWAT officers from St. Paul approached him and

3    he ran around the back of the SA all the way around and then

4    back out onto Maryland Avenue.

5    Q.  Where he was arrested.

6    A.  Correct.

7    Q.  Now, this -- you found some cash along the route?

8    A.  Yes.

9    Q.  How was it packaged or how was it secured?

10   A.  I think it was a 20 and a 5, and they were just on the

11   pavement, but you could see in the video that he had dropped

12   them.

13   Q.  Was there $8,000 found someplace?

14   A.  No.

15   Q.  This is a $20 bill and a $5 bill.

16   A.  It's my understanding, yes.

17   Q.  Okay.  Was he searched at the scene?

18   A.  I believe so.

19   Q.  What did he have on him, anything of significance?

20   A.  Other than his cell phone, I don't know what else he had

21   on him.

22   Q.  Where were those guns stolen?  And I mean

23   geographically.  I don't mean name of the victims, but --

24   A.  Sure.  I believe Apple Valley, Fridley, and then one in

25   Ramsey County.  I don't know which town.

1   Q.  One of the persons who was at the house was a person

2   named Todd Wybierala?

3   A.  May have been.  I know there were two males and a

4   female.

5   Q.  He's a cousin of Mr. Knutson?

6   A.  I believe one of the men did say that they were a

7   cousin.

8   Q.  And what was the name of the other man?

9   A.  I don't know off the top of my head.  May have been

10   James Woller.

11   Q.  Spell that for me, please.

12   A.  W-O-L-L-E-R.  I'm not a hundred percent on that, but

13   that's my recollection.

14   Q.  Now, his cousin Mr. Wybierala has a criminal record,

15   does he not?

16   A.  I don't know.

17   Q.  How about Mr. Woller?  Does he have a record?

18   A.  I don't know.

19   Q.  Did you see a videotape system in the house?

20   A.  There was a surveillance system, yes.

21   Q.  Did you folks seize the DVR box that held the

22   proceedings of the video system?

23   A.  I don't know if it recorded or if it just played real

24   time, but we did seize the system, I believe.

25   Q.  Did you see Mr. Wybierala coming into the house the

1    night before on June 5th carrying these backpacks?

2    A.  I did not.

3    Q.  Have you been told that that was the case?

4    A.  No.

5    Q.  And this would be the backpack that the drugs were found

6    in, the 1481 grams of methamphetamine?

7    A.  I did not see that, no.

8    Q.  So you don't know anything about Mr. Wybierala bringing

9    that into that house.

10   A.  I don't.

11   Q.  There were three guns in the bedroom with the bed.

12   A.  Correct.

13   Q.  Two in the bedroom with no bed.

14   A.  With the futon, correct.

15   Q.  And along with those two guns was the backpack with the

16   methamphetamine in it, right?

17   A.  Correct.

18   Q.  How were those drugs found -- or packaged?  I'm sorry.

19   A.  I believe they were in plastic bags or baggies.

20   Q.  Did you take fingerprints from Mr. Wybierala or DNA

21   swabs from Mr. Wybierala to eliminate him as the possessor

22   of the drugs and the guns?

23   A.  We did not.

24   Q.  Do you got any plans to?

25            MR. DUNNE:  Objection, Your Honor.  Calls for

1    speculation.

2              THE COURT:  I'll allow the answer.

3    A.  I do not.  His fingerprints would already be on file.

4    Q.  Wybierala's?

5    A.  I assume, if he's ever been arrested.

6    Q.  I thought we didn't know if he'd been arrested.

7    A.  I don't know, but I'm saying if he had been arrested,

8    they would be on file.

9    Q.  Now, the mailings that were found in Mr. Knutson's name

10   were addressed to him in Savage, Minnesota, were they not?

11   A.  I don't know.

12   Q.  When did you speak with his mother?

13   A.  I did not.  Pretrial Services called to verify the

14   information that he gave that he lived with her, and she

15   said that was not correct.  He used it as a mailing address,

16   but that he lived at 890 Arkwright.

17   Q.  But this is all *post hoc*, this is after the fact.

18   A.  This is Pretrial Services doing their investigation.

19   Q.  Yeah.  Nobody had spoken to his mother before the raid.

20   A.  Correct.

21   Q.  As far as you know.

22   A.  Correct.

23   Q.  And you don't know whether those mailings were addressed

24   to him at a Savage address.

25   A.  I don't know.

1    Q.  That would be significant, wouldn't it?

2    A.  Well, the fact that they were there is significant

3    because his mother he uses it as a mailing address.  It

4    would make sense that he would receive them there and then

5    bring them to his home.

6            MR. BRINK:  May I have a moment, Your Honor,

7    please?

8            THE COURT:  Absolutely.

9        (Pause)

10   BY MR. BRINK:

11   Q.  You say that Mr. Knutson lived at that house.  Did he

12   have some kind of a possessory interest?  Did he own it?

13   Was he renting it?  Was he subletting it?

14   A.  He was not the lessee.

15   Q.  Who was the lessee?

16   A.  Give me a second and I'll think of it.

17   Q.  Take your time.

18       (Pause)

19   A.  First name's Kelly and I'm blanking on the last name,

20   but I do have a -- I do have that information in my file.

21   Q.  And Kelly is the person who's renting it or the person

22   who owns it?

23   A.  That's the lessee.

24   Q.  Thank you.

25           MR. BRINK:  Your Honor, those are all the

1     questions that I have.

2             THE COURT:  All right.  Thank you, Mr. Brink.

3             Mr. Dunne?

4             (No response)

5             THE COURT:  All right.  Do you care to make --

6     well, you may be excused.

7             Do you care to make argument?

8             MR. DUNNE:  On probable cause we stand on the

9     record.

10            THE COURT:  Okay.  Mr. Brink, do you care to

11    argue?

12            MR. BRINK:  We'll submit to probable cause on the

13    record.

14            THE COURT:  Okay.  The Court will find probable

15    cause for both counts in the complaint, the possession with

16    intent to distribute methamphetamine and felon in

17    possession, based on the evidence we've heard this morning,

18    so I believe there's probable cause for the charges in the

19    complaint, okay?

20            Do you want to move to detention?

21            MR. DUNNE:  Yes, Your Honor.

22            THE COURT:  All right.

23            MR. BRINK:  Your Honor, maybe I can short-circuit

24    this.  I discussed this with Mr. Knutson, and at present we

25    do not have information to rebut the Pretrial Services

1   recommendation for detention, so we would be willing to

2   consent to detention for the time being, and I would then

3   rely on Rule 31 -- or the statute, 18 United States Code,

4   Section 3142(b) -- (f) -- 3142(f)(2)(B), which says:

5           "The hearing may be reopened, before or after a

6   determination by a judicial officer, at any time before

7   trial if the judicial officer finds that information exists

8   that was not known to the movant at the time of the hearing

9   and that has a material bearing on the issue whether there

10  are conditions of release that will reasonably assure the

11  appearance of such person as required and the safety of any

12  other person and the community."

13          I would rely on that provision to reopen this

14  hearing.  My plan is to develop a plan that you would

15  approve to enlarge him on conditions.  What I envision is

16  trying to get him into some kind of a residential treatment

17  program with sufficient safeguards that you would feel

18  comfortable in releasing him.  Right now I do not have that

19  information.  So if I get it, it's going to be new.  And

20  within the constraints of the statutory time frame -- and

21  it's very hard to do that in five days.

22          So I would try to develop a plan, and if I'm able

23  to, I would invoke that provision to reopen this hearing,

24  present that information to you and ask you to enlarge him

25  on conditions.

1          THE COURT:  And the plan, the information that you

2     would bring forward, that's separate and apart from the

3     reports that have not been filed that were the subject of

4     the discussion a moment ago under Rule 26.2.  This is

5     information related to a potential plan.

6          MR. BRINK:  Right, exactly.

7          THE COURT:  I see.

8          MR. BRINK:  And with that, we would consent to

9     detention for the time being.

10          THE COURT:  Mr. Dunne?

11          MR. DUNNE:  Well, first of all, Your Honor, I

12     agree that because of the charges in the complaint, the Bail

13     Reform Act creates a presumption that there are no

14     conditions or combination of conditions that can reasonably

15     assure the safety of the community or the defendant's

16     appearance at future court proceedings subject to rebuttal.

17          It is the opinion of the United States that the

18     defendant cannot rebut that presumption.  I believe that the

19     Court still must issue an order even if there's a waiver of

20     detention, which is what -- Mr. Brink is talking about a

21     consent.  It's a waiver of detention.  The Court still has

22     to issue an order of detention based upon risk of flight,

23     danger to the community, and inability to rebut that

24     presumption.

25          I have no objection if Mr. Brink has new evidence

1    that he wants to bring to the attention of the Court

2    somewhere down the road.  That is the case in every single

3    case we indict.  That can happen.

4         But I do want to urge the Court to understand and

5    Mr. Brink to understand, whether there is a residential

6    treatment plan Mr. Brink can find is amenable to taking

7    Mr. Knutson, it doesn't address the Government's contention

8    that he is a risk of flight and danger to the community,

9    that no condition or combination of conditions will

10   reasonably assure the safety of the community and his

11   appearance in court.

12        So we would continue to argue for detention even

13   after the Court orders it and would like the opportunity to

14   address that issue to the Court if there's new evidence.

15        MR. BRINK:  I understand Mr. Dunne's position and

16   I agree that you do have to issue an order.

17        THE COURT:  Right.  Okay.  Thank you.  And I agree

18   as well, I do have to issue an order.

19        This is a rebuttable presumption case.  The

20   presumption is that there are no conditions that could be

21   imposed short of detention that would reasonably assure

22   Mr. Knutson's appearance for subsequent proceedings or that

23   would reasonably assure the safety of the community.  There

24   hasn't been any rebuttal of that presumption here this

25   morning, and even if this were not a rebuttable presumption

1    case, the Court would find based on many factors, but among

2    them Mr. Knutson's multiple felonies, some of which are

3    violent in nature, some of which are currently open, and on

4    the fact that Mr. Knutson has violated many of the previous

5    releases and been revoked on some, and in addition he has

6    displayed, I think, fairly clear propensity to impulsivity

7    and violence.  And lastly, there have been, at least

8    according to the Pretrial Services Report, I believe ten

9    separate failures to appear, including failure to appear for

10   trial.

11          So, my point is simply this:  Even if this were

12   not a rebuttable presumption case, I would order detention,

13   because I find that there are no conditions that would

14   reasonably assure Mr. Knutson's appearance nor any

15   conditions that would reasonably assure the safety of the

16   community.

17          All that said, Mr. Brink, if you have new evidence

18   such that under 3142 you wish to have a subsequent hearing,

19   obviously it'll be before whatever magistrate, I believe,

20   either has the case or has criminal duty at that time, okay?

21          MR. BRINK:  Fine.  Thank you, Your Honor.

22          THE COURT:  Okay.  Anything further for the

23   Government, Mr. Dunne?

24          MR. DUNNE:  No, Your Honor.

25          THE COURT:  All right.  Anything further for the

```
1       defense, Mr. Brink?

2                   MR. BRINK:  No, Your Honor.

3                   THE COURT:  Okay.  Thank you all.  Court is in

4       recess.

5                   THE CLERK:  All rise.

6                   (Proceedings concluded at 10:21 a.m.)

7                           *     *     *     *

8

9

10                      C E R T I F I C A T E

11

12          I, TIMOTHY J. WILLETTE, Official Court Reporter

13          for the United States District Court, do hereby

14          certify that the foregoing pages are a true and

15          accurate transcription from an audio digital

16          recording of proceedings taken in the

17          aforementioned matter, to the best of my skill

18          and ability.

19

20

21                      /s/ Timothy J. Willette

22              TIMOTHY J. WILLETTE, RDR, CRR, CRC
             Official Court Reporter - U.S. District Court
23                  1005 United States Courthouse
                      300 South Fourth Street
24              Minneapolis, Minnesota  55415-2247
                         612.664.5108
25
```