UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal 17-157(01) MJD

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | **SECOND** |
| | ) | TODD SEAVER KNUTSON'S POSITION |
| vs. | ) | REGARDING SENTENCING, WITH- |
| | ) | DRAWAL OF MOTION FOR EVIDENT- |
| Todd Seaver Knutson, | ) | IARY HEARING, AND MOTION FOR |
| | ) | DEPARTURE OR VARIANCE |
| Defendant. | ) | |

\*                              \*                              \*

Defendant Todd Seaver Knutson, through his counsel, John C. Brink, Esq., respectfully submits this second Position Regarding Sentencing pursuant to Rule 83.10(e) of the Local Rules for the United States District Court for the District of Minnesota, following receipt of the updated Presentence Investigation Report (PSR) filed 3 January 2019 as Docket 84.

INTRODUCTION

Defendant pleaded guilty to Count 3 of a Superseding Indictment (Docket 39) charging him with Possession with Intent to Distribute 500 Grams or More of Methamphetamine Mixture in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). Defendant faces a statutory sentence of 10 years to life and according to the PSR, a United States Sentencing Guidelines (USSG) range of 262 to 327 months. Presentence Investigation Report (PSR) at 37, ¶¶170 and 171. Defendant pleaded guilty pursuant to a Plea Agreement and Sentencing Stipulations (Docket 74) that provided that he reserved the right to move for a departure and/or variance. *Id.* at 5, ¶6(j). The Government agreed to recommend a sentence within the USSG range of 235 to 293 months. *Id.* Accordingly, Defendant now moves the Court to conclude that Defendant is not a career offender or to depart or vary to a sentencing range that would apply were he not a career offender; to depart downward from either USSG range pursuant to USSG § 5H1.3, p.s., and/or USSG 5H1.4, p.s.; to grant a

variance downward based upon the factors in Title 18, Section 3553(a) to achieve a substantively reasonable sentence; to employ the comparative drug purity/mixture guidelines as a framework for variance to a substantively reasonable sentence; and to grant Defendant a variance for "hardship" presentence incarceration.

ARGUMENT

I.

Career Offender:

Defendant objects to his classification as a Career Offender under USSG § 4B1.1 and consequent offense level 34, and a sentencing guideline range of 262-327 months.  PSR ¶¶ 35, 82, 84, 91, 171, and, Addendum A.1-A.2.  The parties entered into a Plea Agreement and Sentencing Stipulations (Docket 74) that did not classify Defendant as a career offender and contemplated his offense level as 33, criminal history category VI, with a sentencing guideline range of 235 to 293 months.  Plea Agreement at 4-5.  In his response to the Preliminary Presentence Report dated November 26, 2018, Government counsel addressed the issue of U.S. Probation determining Defendant to be a career offender.  Government counsel averred that he would instead abide by the Plea Agreement and advocate for the 235 to 293 month sentence range specified therein at paragraph 6(f) for offense level 33, criminal history category VI.  Accordingly, Defendant moves the Court to depart or grant a variance, as appropriate, to reach that agreed upon offense level range, subject to Defendant's argument regarding the purity/mixture guidelines for methamphetamine, *infra*.

II.

Departure:

Because of his mental and emotional conditions as documented below, Defendant respectfully moves the Court to depart downward from the USSG range. USSG § 5H1.3, p.s., provides that "[m]ental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics are present to an unusual degree and distinguish the case from the typical cases . . . ." Further, USSG § 5H1.4, p.s., provides that although drug or alcohol dependence or abuse ordinarily is not a reason for a downward departure, "In certain cases a downward departure may be appropriate to accomplish a specific treatment purpose[,]" such as getting the defendant into treatment at an earlier time.

On Defendant's motion the Federal Bureau of Prisons (BOP) performed a psychological Forensic Evaluation of Defendant as part of the presentence investigation to determine whether Defendant is in need of psychological or psychiatric care. Motion for Psychological or Psychiatric Examination of Defendant and Hearing Thereon (Docket 75). In that Motion, Defendant also requested an evidentiary hearing on the report. *Id.* at 4. Having reviewed the Forensic Evaluation, Defendant does not believe an evidentiary hearing is necessary and withdraws the request for hearing.

The Forensic Evaluation revealed that Defendant was a victim of physical and sexual abuse by his mother's boyfriend from age 10 to 12. *Id.* at 3. He sustained several head injuries as a child. *Id.* After behavior problems at school, he dropped out during ninth grade. *Id.* He later attained a GED and a cabinetry certificate in 2003 while incarcerated. *Id.* His employment history was spotty, at best, in part due to excess alcohol consumption. *Id.* Defendant's mental health

issues surfaced at age 8 or 9 with treatment for ADHD and Bipolar disorder.  *Id.*  He was hospitalized twice for behavioral problems.  *Id.*  He has been prescribed multiple psychotropic medications throughout his lifetime including antipsychotics, antidepressants, mood stabilizers, and psychostimulants.  *Id.* at 3-4.  He suffered extensive alcohol and substance abuse beginning at age 12.  *Id.* at 4.  This included alcohol, cannabis, methamphetamine, crack, benzodiazepines, and opioids.  *Id.*  All this went untreated.  *Id.*  This began at age 12 and continued on a regular basis until he was arrested for this offense.  *Id.*  That would constitute over a 20-year period of constant abuse of serious psychoactive substances.  During his recent BOP evaluation he attempted suicide by ingestion of razor blades, batteries, and a nail clipper for which he was hospitalized for seven days until the objects passed through his digestive system and then was placed on "suicide watch" for two more days at the BOP evaluation facility.  *Id.* at 5.  The BOP psychologist diagnosed him as having an "extensive history of substance abuse."  *Id.* at 6 – 7, 8.  She diagnosed him as suffering from Alcohol Use Disorder, Cannabis Use Disorder, Stimulant Use Disorder, and Opioid Use Disorder.  *Id.* at 7.  Her final diagnosis was "Unspecified Bipolar Disorder."  *Id.* at 8.  While the BOP psychologist concluded that "The defendant does not demonstrate any active symptoms of a major psychiatric disorder that would affect the sentence; however, it is recommended that Mr. Knutson participate in a number of specific interventions."  *Id.* at 9.

This astonishing history of mental health issues is confirmed in the PSR at 30 – 33, ¶¶125-40.  The PSR documents his physical and sexual abuse by his mother's boyfriend at age 12 and the bloody nose the boyfriend gave him.  *Id.* at 30  ¶125.  He feared this "stepfather" so much he wet himself.  PSR at 30, ¶125.  At age 12 Defendant began acting out and stole his mother's car to get away from her boyfriend.  *Id.*  He was bullied by schoolmates because of his difficulty with reading and writing.  *Id.* at 30, ¶126.  He suffered from and was treated for ADHD.  *Id.* at 30, ¶127.

4

In 2010 he was hospitalized at St. Paul Regions Hospital for seven days with delusions and visual hallucinations and referred to Stearns County for civil commitment. He was committed as mentally ill and chemically dependent. PSR. at 31, ¶¶129-30. He was diagnosed with schizophrenia, unspecified bipolar disorder, methamphetamine abuse, and cannabis dependence at Community Addiction Recovery Enterprise, Fergus Falls, Minnesota. *Id.* at 31, ¶131. From January to April 2012, he had a mentally ill and dangerous commitment pending in Chisago County, which was dismissed in April. *Id.* at 31, ¶133. More currently, Sherburne County Jail records show that he suffers from Adjustment Reaction, NOS; Antisocial Personality Disorder; Bipolar II; Borderline Personality Disorder; and, Cluster B Personality Disorder. He acknowledged suicidal ideation and was placed on "suicide watch." *Id.* at 32, ¶¶135-36. While in the BOP evaluation this Court ordered, he was placed on suicide watch for two days for swallowing razor blades, batteries, and a nail clipper. Forensic Evaluation at 5, PSR at 33, ¶138.

Any reasonable lay person with common sense hearing this stunning record of mental health issues would conclude Defendant is a person sorely in need of major psychiatric/psychological treatment intervention.

Equally remarkable is Defendant's history of drug abuse, documented in the PSR at 33 – 35, ¶¶141-56. Defendant, at age 12, began using alcohol and marijuana and could not cite a period of long-term sobriety (abstinence) while out of custody dating to his arrest for this offense. Forensic Evaluation at 4, PSR at 33, ¶¶ 141-42. He was under the influence of drugs or alcohol in *every* criminal matter he has incurred. *Id.* at ¶ 141. During this 22-year period *daily* he used alone, or in some combination, marijuana, alcohol, PCP, LSD, methamphetamine, Percocet, ecstasy, K2, and opioids. PSR at 33 – 35. At the time of his arrest for this matter, he was using an "eight-ball"

(3.5gms) of methamphetamine a day.  PSR at 33, ¶144.  He had been addicted to methamphetamine for 17 years.  *Id.*

The Court should depart downward from the PSR's USSG range of 262 to 327 months.  His imposing mental and emotional issues clearly meet the standard for departure of USSG § 5H1.3, p.s., that "[m]ental and emotional conditions may be relevant in determining whether a departure is warranted, *if such conditions, individually or in combination with other offender characteristics are present to an unusual degree and distinguish the case from the typical cases . . . ."*  (Emphasis added.)  Further, USSG § 5H1.4, p.s., provides that "drug or alcohol dependence or abuse *ordinarily* is not a reason for a downward departure . . . ."  (Emphasis added.)  But no one would contend with a straight face that this is the "typical" or "ordinary" case.  In Defendant's case, less punishment imprisonment time and more supervised-release substance abuse treatment time is the most sensible and appropriate disposition.  "[I]t is highly recommended that a defendant who is incarcerated also be sentenced to supervised release with a requirement that the defendant participate in an appropriate substance abuse program."  *Id.*  "In certain cases a downward departure may be appropriate to accomplish a specific treatment purpose[,]" such as getting the defendant into treatment at an earlier time.  *Id.*  With a statutory supervised-release term of 5 years to life,[1] this Court has adequate flexibility to impose a sensible punitive period of incarceration (which is certainly not 262 months imprisonment) followed by a lengthy period of supervised-release with substance abuse treatment as a component.  This is, after all, a possessory case.  The guns seized by authorities were nothing more than a manifestation of methamphetamine fueled paranoia.  That will not abate without effective treatment.

---

[1]  21 U.S.C. § 841(b)(1)(A) and 18 U.S.C. § 3583(a).

III.

Variance:

A.   Section 3553(a) Factors

In the alternative to a departure under the USSG, Defendant moves the Court to grant a variance pursuant to Section 3553(a) to reach a substantively reasonable sentence.

As the Court well knows, it shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a) which include:

(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;
(2)  the need

    (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B)  to afford adequate deterrence to criminal conduct;
    (C)  to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(6)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7)  the need to provide restitution to any victims of the offense.

A sentence to the mandatory minimum ten years of imprisonment followed by a suitable period of supervised-release to afford Defendant treatment for his mental and emotional issues and substance abuse satisfies all these criteria.

*The nature and circumstances of the offense*:

Defendant pleaded guilty to the possessory offense of methamphetamine with intent to distribute.  Guns and ammunition were also seized.  The possession violation speaks for itself. There was no use of any weapons in any manner.

*The history and characteristics of the defendant*:

Defendant's criminal history bespeaks exactly what one would expect to see from a person of a deprived, violent, neglected, abused, childhood who was suffering from untreated mental illness from age 8 or 9 with ADHD and Bipolar disorder and from severe drug addiction from age 12 onward.  One cannot accumulate Defendant's number of police contacts and criminal history points without severe emotional and mental health issues.

*To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the **offense***:

A sentence of ten-years' imprisonment is more than sufficient to satisfy these purposes.

*To afford adequate deterrence to criminal conduct*:

Ten-years' imprisonment is a lengthy sentence that serves adequately to deter Defendant from future crime and to deter others who may be so inclined.

*To protect the public from further crimes of the defendant*:

If Defendant is incarcerated for ten years, he obviously cannot be a threat to the public during that time period.

*To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner*:

Ten years is a sufficient time period to accomplish these purposes.

*The need to avoid unwarranted sentence disparities among defendants with similar **records** who have been **found guilty** of similar conduct*:

There were no co-defendants in this matter.

*The need to provide restitution to any victims of the **offense***:

There is no issue of restitution in this matter.

Mindful that the statutory mandate is that the sentence be "sufficient, but not greater than necessary" to accomplish these goals, Defendant requests the Court to sentence him to the ten-year

statutory mandatory minimum with a supervised-release term and conditions appropriate to his rehabilitation.  Sentencing does not have to be senseless.

IV.

Variance

B.   Drug Purity Guidelines as a Framework for Variance

If Defendant were subject to the methamphetamine *mixture* guidelines, his numbers would yield a total offense level of 29 and a guideline range at criminal history category VI of 151-188 months.  (Base offense level 30, plus 2 levels for possession of a gun, equals level 32, minus 3 levels for acceptance of responsibility equals a total offense level of 29.)  This is more than a nine-year difference between the pure/actual guidelines of the PSR (262-327) and the mixture guidelines at the low end of the guidelines ranges.

Although in the Plea Agreement, ¶6(a), the parties agreed that offense involved "at least 500 G but less than1.5 KG of methamphetamine (actual)[,]" the following analysis is offered merely to provide an analytical framework within which the Court can fashion a variance to achieve a substantively reasonable sentence.

Defendant requests that the Court cast a critical eye at the 5-level guideline difference between the mixture and purity amounts of methamphetamine and to consider:

1)  Why and how the methamphetamine guidelines were created in USSG § 2D1.1 and how they do not reflect the typical empirical approach used in the construction of other guidelines,

2)  How methamphetamine purity is no longer a proxy for culpability, and

3)  How something as arbitrary as whether or not the methamphetamine is tested can drastically alter the guideline range.

In consideration of these arguments and the specific facts and circumstances of this case, Defendant asks the Court to reject the 10-to-1 ratio arbitrarily created within the methamphetamine

guidelines and to consider that a sentence of ten years as sufficient, but not greater than necessary under these circumstances.

### THE USSG § 2D1.1 METHAMPHETAMINE GUIDELINES DESERVE LITTLE DEFERENCE

This Court should reject the base offense level applicable to methamphetamine actual/ice offenses because they (1) lack an empirical basis for the 10:1 ratio, (2) no longer accurately indicate that a defendant is closer to the source (because the drugs are purer) and thereby occupies a higher level in the conspiracy, and (3) suggest sentencing ranges that are far greater than necessary.

In the years following the Supreme Court's ruling in *United States v. Booker*, 543 U.S. 220 (2005), the relationship between a sentencing court and the sentencing guidelines has evolved well beyond the "advisory" label given to the guidelines by the Supreme Court.  In more recent decisions, the Supreme Court has elaborated on the discretion a district court has to make sentencing decisions based on the facts of each case and broader policy questions.  *Spears v. United States*, 129 S.Ct. 840, 843-44 (2009); *Kimbrough v. United States*, 128 S.Ct. 558, 575-76 (2007); *Gall v. United States*, 128 S.Ct. 586, 597-98 (2007).  The practical reality after these decisions is that a sentencing judge, in evaluating each unique person that stands to be sentenced along with facts of each case, may "reject (after due consideration) the advice of the Guidelines." *Kimbrough*, 128 S.Ct. at 577 (Scalia, J., concurring).  Further, the sentencing court may vary from the advisory guideline range based solely on policy considerations, including disagreement with the policy underlying the guidelines in a case.  *Id.* at 570.  This is true "even in the mine-run case." *Id.* at 563.

In *Kimbrough v. United States*, 552 U.S. 85, 128 S.Ct. 558 (2007), the Supreme Court considered whether a sentencing court could sentence outside the applicable guideline range, not

based on the particular circumstances of that case, but rather because of a policy disagreement with the sentencing guidelines.  In *Kimbrough*, the defendant faced a guideline range of 168 to 210 months for three crack cocaine charges, plus an additional five years for a gun, resulting in a total guideline range of 228 to 270 months.  Noting the disparity between crack cases and powder cocaine cases, the district court pointed out that the defendant's guideline range would have been 97 to 106 months had the offense involved powder (including the gun).  Concluding that the fifteen-year statutory mandatory minimum was "clearly long enough" to accomplish the objectives enumerated in § 3553(a), the district court varied from the guideline range and sentenced the defendant to 180 months.

The Supreme Court affirmed, holding that where a particular guideline is not based on empirical evidence, it is not an abuse of discretion for a district court to impose sentence below the guidelines based solely on broad policy concerns.  Thus, in *Kimbrough*, for example, the district court was free to impose a significant downward variance even in a mine-run case (an average case with no distinguishing circumstances or offender characteristics bearing on sentencing) based solely on the district court's policy disagreement with the 100-to-1 crack to powder disparity embodied in the guidelines.

The *Kimbrough* Court explained the role of the Sentencing Commission vis-à-vis the district courts as follows:

> Congress established the commission to formulate and constantly refine national sentencing standards.  Carrying out its charge, the Commission fills an important institutional role: It has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.

*Id*. at 574 (citations omitted).  Given that expertise, based on empirical data of past sentencing practice, the guideline range typically provides a rough approximation of the appropriate sentence.

The crack cocaine guidelines, however, did not fit that model:

> The crack cocaine Guidelines . . . do not exemplify the Commission's exercise of its characteristic institutional role. In formulating Guidelines ranges for crack cocaine offenses, as we earlier noted, the Commission looked to the mandatory minimum sentences set in the 1986 Act, and did not take account of "empirical data and national experience." . . . Given all this, it would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence "greater than necessary" to achieve § 3553(a)'s purposes, even in a mine-run case.

*Id.* at 575 (citation omitted).  The methamphetamine guidelines are no different.

### The Methamphetamine Guidelines Lack An Empirical Basis.

What the *Kimbrough* Court said about the crack cocaine guidelines applies with equal force to the methamphetamine guidelines, which were based in part on the crack guidelines.  *See*, *e.g.*, *United States v. Valdez*, 268 Fed. App'x 293, 297 (5th Cir. 2008); *United States v. Goodman*, 556 F. Supp. 2d 1002, 1010-11, 1016 (D. Neb. 2008). In fact, it applies to all drug guidelines that are based on mandatory minima, rather than empirical data. *See Gall v. United States*, 552 U.S. 38, 46 n.2 (2007) (noting, "Sentencing Commission departed from the empirical approach when setting the Guidelines range for drug offenses").

In considering the methamphetamine guidelines, this Court should first consider the guidelines as they existed in 1987.  The initial Drug Quantity Table in the 1987 guidelines manual did not include methamphetamine offenses because the 1986 Anti-Drug Abuse Act did not include mandatory minima for methamphetamine.[2] Instead, the Commission assigned methamphetamine an equivalency equal to twice that of cocaine so that 1 gram of methamphetamine equaled 0.4 grams of heroin, 2 grams of cocaine, or 400 grams of marijuana.[3] As a result, 1.5 kilograms of

---

[2] *See* Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, § 3207-2.
[3] *See* USSC, Methamphetamine: Final Report of the Working Group 7 (1999) [Methamphetamine Report], available at

methamphetamine was treated the same as 3 kilos of cocaine.[4] Both were assigned a base offense level of 28. It is unknown how the Commission derived these initial equivalencies and penalties because methamphetamine offenses were not included in the Commission's study of pre-Guideline sentencing practices.[5]

In 1988, Congress established mandatory minima for methamphetamine offenses.[6] Congress set the quantity triggers for "serious" traffickers (subject to the 5-year mandatory minimum) and "major" traffickers (subject to the 10-year mandatory minimum) at 10 grams and 100 grams of pure methamphetamine and at 100 grams and 1 kilogram of methamphetamine mixture, respectively.[7]

Though it was not required to do so, the Sentencing Commission responded to the Congressional Act "by incorporating these statutory penalties into the drug trafficking guideline" by linking the guideline ranges at levels 26 and 32 to the statutory quantity triggers and ramping up higher quantities proportionally, as it had done for other controlled substances subject to mandatory minima.[8] As a result, the new guidelines now equated one gram of methamphetamine

---

http://www.ussc.gov/Research/Working_Group_Reports/Drugs/199911_Meth_Report.pdf (last accessed July 1, 2018), at 7-8.

[4] *Id*. at 7 (admitting that the methamphetamine guidelines were "based largely on information provided by the Drug Enforcement Administration.").

[5] *See* U.S.S.C., Supplementary Report on the Initial Sentencing Guidelines and Policy Statements (1987).

[6] *See* Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 6470(g).

[7] *Id*.

[8] *See* U.S.S.C., Methamphetamine: Final Report of the Working Group 7 (1999) [Methamphetamine                                                                                         Report], http://www.ussc.gov/Research/Working_Group_Reports/Drugs/199911_Meth_Report.pdf.(last accessed July 1, 2018), at 8; see also *id*. at 18 (explaining that instead of correlating guideline ranges to mandatory minima across all offense levels, the Commission could have set guidelines independently of mandatories and allowed the mandatory minima to "trump" guideline ranges only in cases in which they exceeded the top of the guidelines).

with five grams of cocaine, rather than two the year before.  This increase was not based on any empirical data or sentencing expertise.

Then, in 1998, at the urging of the Justice Department, Congress again increased the penalties for methamphetamine, cutting in half the quantities that triggered the mandatory minima.[9] As a result, 5 grams of methamphetamine (actual/ice) now triggers the 5-year mandatory minimum and 50 grams of methamphetamine (actual/ice) triggers the ten-year mandatory minimum.  Congress's intent was to make the penalties for methamphetamine (actual/ice) the same as they were for crack.[10]

As Commission staff considered what the Commission should do in response to the new mandatory minima for methamphetamine (actual/ice), it recognized that "[t]he Commission is not required by the legislation to amend the guidelines" for methamphetamine (actual), and it could simply allow the mandatory minima to "trump" guideline ranges. In a revealing comment, however, the Commission concluded that

> Un-linking the Drug Quantity Table from the mandatory minimum quantities established by Congress in a manner that reduces sentences would vary from past practice of the Commission and *may prove politically unwise*.[11]

(emphasis added). As a result, in an exercise of raw politics, the Sentencing Commission again increased the guidelines to match the mandatories.

Of course, none of the increases in the offense levels had anything to do with an examination of sentencing practices or any of the sentencing objectives set out in 18 U.S.C. §

---

[9] *See* Methamphetamine Trafficking Penalty Enhancement Act of 1998, Pub. L. No. 105-277, 112 Stat. 2681 (1998); see H.R. Rep. No. 105-711, pt. 1, at 8 (1998) (setting forth the Department's position in support of H.R. 3898, a bill similar to the one passed, and its view that penalties for methamphetamine should be the same as crack).

[10] *See, e.g.*, *id.*; *see also* 144 Cong. Rec. S4035 (May 1, 1998) (Sen. Ashcroft); 144 Cong. Rec. S12834 (Oct. 21, 1998) (Sen. Feinstein).

[11] *Id.* at 18 (emphasis added).

3553.  In fact, the severe penalties for methamphetamine are not justified by any purpose of sentencing. As to the seriousness of the offense, 18 U.S.C. § 3553(a)(2)(A), methamphetamine is no more physically dangerous or addictive than heroin or cocaine, yet methamphetamine is now punished more severely than any other drug.

To rectify past injustices, Congress has now reduced the drug quantity disparity between powder and crack cocaine. And, of course, the Sentencing Commission has followed suit by amending the guidelines for crack cocaine offenses. Meanwhile, although Congress acted explicitly in 1998 to make the mandatory minima applicable to methamphetamine equal to those of crack cocaine, the methamphetamine guidelines remain unchanged.  They have not been reduced.

As a result, whatever the rational may have once been for the steady *increase* in the methamphetamine and the crack cocaine guidelines, the rational for the *decrease* of the crack cocaine guidelines has not been extended to methamphetamine.  Now, because one has been adjusted and the other has not, 1.5 kilograms of methamphetamine (actual/ice) is treated the same as 8.4 kilograms of crack cocaine, 150 kilograms of powder cocaine, 30 kilograms of heroin, and 30,000 kilograms of marijuana, as they all yield a base offense level of 36.[12] The rationale for this remains a mystery.

If Defendant were to be sentenced for a methamphetamine mixture, or the same amount of crack cocaine, rather than methamphetamine actual/ice, his offense level would be 30.  After a two-level increase for possession of a firearm and a three-level reduction for acceptance of responsibility, Defendant's guideline range in level 29, criminal history category VI, would be 151- 188 months.

---

[12] *See* U.S.S.G. § 2D1.1 (c), Drug Quantity Table.

Several district courts across the country "have found that the Guidelines ranges for offenses involving actual/pure methamphetamine, like their crack-cocaine counterparts, are not based on empirical data or national experience, and thus do not exemplify the Commission's exercise of its characteristic role." *United States v. Ferguson*, 2018 WL 3682509, at *3 (D. Minnesota August 8, 2018) (Tunheim, J.)[13]; *see also United States v. Kehler*, 17-CR-196 (Frank, D.)(noting a policy disagreement with guidelines due to lack of empirical basis to conclude that purity is probative of defendant's role or position in the chain of distribution).

### The Purpose for The Methamphetamine Guideline Disparity is No Longer Accurate.

The current guidelines establish base offense levels for methamphetamine offenses that depend on the drug's purity.[14] Unfortunately, "[t]he methamphetamine guidelines are based on a flawed premise … that drug purity is a proxy for culpability." *United States v. Nawanna*, 2018 WL 2021350 (N.D. Iowa) May 1, 2018). The explanation for this premise appears to be in U.S.S.G. § 2D1.1, Application Note 27 (c), which states:

> The purity of the controlled substance … may be relevant in the sentencing process because it is probative of the defendant's role or position in the chain of distribution. Since controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of *unusually pure narcotics* may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs.

---

[13]  *Citing United States v. Harry*, No. 17-1017, 2018 WL 2717224, at *3-5 (N.D. Iowa June 6, 2018) (Strand, C.J.); *United States v. Nawanna*, 2018 WL 2021350 (N.D. Iowa May 1, 2018); *United States v. Ibarra-Sandoval*, 265 F. Supp. 3d 1249, 1252-54 (D.N.M. 2017) (Brack, J.); *United States v. Jennings*, No. 16-48, 2017 WL 2609038, at *2-4 (D. Idaho June 15, 2017) (Winmill, C.J.); *United States v. Ortega*, No. 09-400, 2010 WL 1994870, at *4-7 (D. Neb. May 17, 2010) (Bataillon, C.J.).

[14]  The Guidelines treat methamphetamine greater than 80% pure as "pure" methamphetamine, or "ice." U.S.S.G. § 2D1.1(c), n.(C).

(emphasis added).  However, this assumption is now a fallacy.  Contrary to this premise, methamphetamine seized and tested in Minnesota today is often 95 – 100 percent pure, and nationally, "methamphetamine per-gram purity levels averaged above 90 percent, while prices remained low and stable."[15]



| | 1st | 2nd | 1st | 2nd | 1st | 2nd | 1st | 2nd | 1st | 2nd | 1st |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2011 | | 2012 | | 2013 | | 2014 | | 2015 | | 2016 |
| Purity | 92.3% | 93.2% | 95.1% | 94.8% | 95.7% | 96.7% | 96.5% | 96.2% | 95.6% | 97.5% | 95.9% |
| Potency | 75.6% | 77.5% | 85.4% | 90.0% | 93.0% | 93.9% | 94.0% | 89.0% | 86.7% | 88.9% | 90.2% |

SOURCE: DEA METHAMPHETAMINE PROFILING PROGRAM[16]

In fact, it is undisputed that compared to the past, when a majority of the methamphetamine was manufactured in the United States, "[m]ost of the methamphetamine available in the United States is now produced in Mexico and smuggled across the SWB [southwest border] and is a high-

---

[15] U.S. Dep't of Justice, Drug Enforcement Admin., *2017 National Drug Threat Assessment* 70 (2017), available at https://www.dea.gov/sites/default/files/2018-07/DIR-040-17_2017-NDTA.pdf (last accessed October 10, 2018) at 69.

[16] *Id.* at 70-71. ("The DEA MPP [Methamphetamine Profiling Program] provides an in-depth chemical analysis of selected methamphetamine samples to establish trends associated with the manufacture of methamphetamine seized primarily in the United States. The MPP further establishes the method used to manufacture methamphetamine, as well as purity levels and other related trends.").

purity, high-potency, low-cost alternative."[17] In recognition of this, Courts across the country are starting to realize that creating a sentencing disparity based on purity makes little sense when "today's high average methamphetamine purity means that most defendants would be sentenced according to the harsher methamphetamine-actual Guidelines."[18] In the District of Minnesota, Chief Judge John R. Tunheim concluded, "[T]he prevalence of high-purity methamphetamine virtually guarantees that a defendant's base offense level under the Guidelines will substantially increase if the methamphetamine is tested for purity – a decision that can be completely arbitrary." *Ferguson*, 2018 WL 3682509 at *4.

Thus, in addition to the unjustified sentencing increase in all cases where drug testing *occurs*, other courts have noticed that sometimes drugs aren't tested at all, creating an additional sentencing disparity between similar defendants. In the District of Idaho, Chief Judge Winmill explains,

> The reasons why testing is or is not performed in any case are completely arbitrary. In many cases, only some of the drugs were seized and available for testing. In others, the testing lab was too busy to complete testing before sentencing. In some, the wise defendant pled guilty early in the case so that sentencing would occur before testing could be completed. In many cases, the prosecution originated with a state agency where testing could not be completed in a timely manner. Regardless,

---

[17] *Id*. at 73 (explaining that The Combat Methamphetamine Epidemic Act (CMEA) of 2005, which regulated the over-the-counter sale of ephedrine, pseudoephedrine and phenylpropanolamine, has brought methamphetamine laboratory seizures to the lowest level in almost 16 years).

[18] *See United States v. Ferguson*, 2018 WL 3682509, at *4 (D. Minnesota August 8, 2018) (Tunheim, J.)("methamphetamine purity is no longer a proxy for, and thus not probative of, the defendant's role or position in the chain of distribution."); *United States v. Ibarra-Sandoval*, 265 F.Supp.3d 1249, 1256 (D.N.M. 2017)(refusing to punish low level courier "with a sentence intended for high-level criminals"); *United States v. Nawanna*, 2018 WL 2021350 (N.D. Iowa May 1, 2018)(holding methamphetamine guidelines are based on flawed assumption that purity is proxy for role in the offense); *United States v. Harry*, 2018 WL 2717224 (N.D.Iowa June 6, 2018)(holding drug purity is not an accurate proxy for culpability and 10:1 ratio is not based on empirical evidence); *United States v. Hartle*, 2017 WL 2608221 (D.Idaho June 15, 2017)(holding 10:1 ratio is "not empirically justified, and the arbitrariness of lab testing only compounds the issue").

none of these reasons relate to the defendant's culpability or the danger which he
or she poses to society.

*United States v. Hartle*, 2017 WL 2608221, at *3 (D.Idaho June 15, 2017).  Thus, an argument for

sentencing uniformity also fails when the guidelines are being dictated by whether or not testing

has been performed at the time of sentencing. These disparities lead to the unjust over-sentencing

of low-level drivers and dealers, while higher-level kingpins may receive shorter sentences.  For

these reasons, the methamphetamine-pure/actual guidelines should be rejected in favor of the

mixture guidelines.

V.

Variance:

**DEFENDANT IS DESERVING OF CREDIT FOR HARDSHIP TIME**

Defendant respectfully requests that this Court consider granting him additional credit for the

nineteen months he has spent in presentence custody based on the totality of the conditions at the

jail and the physical and psychological difficulties of serving a sentence without programming,

outside time, or other diversions.

Defendant has been housed at the Sherburne County Jail and Miami Federal Detention Center

since he was taken into U.S. Marshal custody on June 8, 2017.  As the Court knows, the conditions

include:

1)  Overcrowding in the living units,

2)  Confinement of both Minnesota Department of Corrections inmates and federal pre-trial
    detainees together in the same living units, sometimes as roommates,

3)  Virtually no programming, activities, rehabilitative programs, or jobs available to the
    inmates,

4) Limited exercise, one hour per day, Monday through Friday in two very small gyms, packed with approximately 50 inmates and no exercise machines (with the exception of six exercise bicycles for the 50 approximate inmates),

5) No contact visitation (only video visitation is available),

6) No outdoor recreation time for inmates,

7) Exorbitantly priced telephone services through Securus Technologies requiring inmates to pay $8.00 for 20 minutes for a local phone call and $15.00 for 20 minutes for collect calls, and

8) Indifference to medical needs and inadequate medical care for inmates.

Although there is little a court can do about the conditions in which the pretrial inmates are held, Defendant respectfully asks this Court to consider that serving any part of a sentence under these terms is considerably more punitive than it would be in a prison with programming, recreation, and outside time.  As such, Defendant requests a downward variance for hardship time.

## CONCLUSION

For the foregoing reasons, the Court should conclude that Defendant is not a career offender or to depart or vary to a sentencing range that would apply were he not a career offender; to depart downward from either USSG range pursuant to USSG § 5H1.3, p.s., and/or USSG 5H1.4, p.s.; to grant a variance downward based upon the factors in Title 18, Section 3553(a) to achieve a substantively reasonable sentence; to employ the comparative drug purity/mixture guidelines as a framework for variance to a substantively reasonable sentence; and to grant Defendant a variance

for "hardship" presentence incarceration.

Dated: 18 January 2019                          JOHN C. BRINK, LAWYER

                                                s/John C. Brink
                                                John C. Brink
                                                A.R. #11587
                                                Suite 1008
                                                Flour Exchange Building
                                                310 Fourth Avenue South
                                                Minneapolis, Minnesota 55415
                                                Office:        612-371-0722
                                                Cellular:      612-382-6789 (preferred)
                                                E-mail: johncharlesbrink@gmail.com

                                                ATTORNEY FOR DEFENDANT